# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 52216

RHODA SHAW, by and through her
Guardian and Conservator CYNTHIA BECK,

    Plaintiffs-Appellants,

v.

BOBBY SHAW and DEANNA FOX SHAW,
husband and wife; THOMAS SPADE, an
individual,

    Defendants-Respondents,

and

DOES 1-100,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Moscow, April 2026 Term

Opinion filed: July 8, 2026

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County. Lamont C. Berecz, District Judge.

The judgment of the district court is <u>affirmed</u>.

Bristol | George, Coeur d'Alene, for Appellant Rhoda Shaw. J. D. Bristol argued.

Winston & Cashatt Lawyers, Coeur d'Alene, for Respondents Bobby Shaw and Deanna Fox Shaw. Michael T. Howard argued.

Elsaesser Anderson, Chtd., Priest River, for Respondent Thomas Spade. Katharine Elsaesser argued.

---

MOELLER, Justice.

This appeal concerns competing interstate jurisdiction in two matters: a guardianship proceeding in Arizona and a quiet title action in Idaho. Specifically, we are asked to determine whether Arizona's initial jurisdiction over a guardianship proceeding prevented an Idaho court

from later exercising jurisdiction over a quiet title action regarding ownership of real property in Idaho.

Rhoda Shaw, a widow, has two children: Cynthia Shaw Beck and Bobby Shaw. Rhoda[1] owned two homes: a lakeside, two-unit structure in Sandpoint, Idaho, and a primary residence in Pearce, Arizona. On September 7, 2021, Rhoda quitclaimed all her interest in the Idaho structure to her son, Bobby. After learning of the transfer, Cynthia filed a petition in Arizona seeking to be named as Rhoda's guardian and conservator in November 2021, which the Arizona court granted. Then, on July 1, 2022, Cynthia, acting as Rhoda's guardian and conservator, filed a complaint in Bonner County, Idaho, against Bobby, Deanna Shaw (Bobby's wife), and Thomas Spade, seeking to quiet title to the two-unit structure and a declaratory judgment invalidating the transfer from Rhoda to Bobby. Cynthia also brought a claim of constructive fraud and sought punitive damages. She later attempted to amend her complaint multiple times. The Idaho district court scheduled the trial to begin on February 28, 2024.

As the Idaho action was pending, Cynthia returned to the Arizona court that granted the guardianship and petitioned the court to determine the date when Rhoda first became incapacitated. The Arizona court set a date preceding the date the guardianship action was filed. Cynthia made several attempts to have the Idaho court enforce the conclusions of the Arizona court, but it refused. Cynthia then filed a third motion to amend her complaint on January 8, 2024, asking the district court to remove the constructive fraud claim but add new claims for undue influence, tortious interference, and constructive trust. She also sought to add an additional defendant, Barbara Spade (Thomas Spade's wife). The court denied the motion at a hearing on January 22, 2024. Following the bench trial, the district court dismissed all of Cynthia's claims and quieted title to the property in Bobby's name.

On appeal, Cynthia assigned three points of error to the Idaho district court, arguing that it (1) abused its discretion by denying Arizona's jurisdiction over the conveyance, (2) erred in denying her third motion to amend her complaint, and (3) erred in its interpretation of a 1985 quitclaim deed that initially granted an interest in the property to Bobby. For the reasons set forth below, we affirm the Idaho district court's judgment.

---

[1] This opinion refers to some parties by their first names to avoid confusion because many individuals share surnames (i.e., Shaw, Beck, and Spade).

# I.  FACTUAL AND PROCEDURAL BACKGROUND

Because the facts in this matter are complex, and the sequence in which they occurred is critical, a chart containing the respective timelines for the events in Idaho and Arizona is provided at the conclusion of this section. *See* Figure One, *infra*.

## A. History of the subject property and Rhoda's cognitive issues

Rhoda and Morgan Shaw, husband and wife, owned a cabin on the shores of Lake Pend Orielle in Sandpoint, Idaho, since the 1950s. When the original structure burned down in 1999, Rhoda and Morgan rebuilt the residence as a two-unit structure, which is the property in dispute in this appeal ("the property"). They also purchased property in Pearce, Arizona in 1971, which became their main residence.

Rhoda and Morgan had two children: Bobby and Cynthia. In 1985, Rhoda and Morgan quitclaimed their interest in the property to "Morgan Shaw and Rhoda Shaw, husband [and] wife, and Bobby Shaw, single man[.]" Ever since, Bobby has lived on the property. Bobby later married Deanna[2] Fox Shaw in 2018. Thomas Spade, who is married to Rhoda's sister, Barbara Spade, lives in Sandpoint and assists Bobby. He is also Bobby's neighbor. The district court found that "it is clear based on Bobby's mental limitations that [Thomas] looked after Bobby and helped Bobby."[3] Morgan died intestate in 2011.

Cynthia and her husband, Larry Beck, have lived near Rhoda in Pearce, Arizona since Rhoda became ill in 2020. Cynthia first learned of Rhoda's deteriorating health in 2020 when Rhoda's neighbors called her and explained that Rhoda lost a substantial amount of weight and observed that she had trouble walking. Cynthia took Rhoda to a series of medical appointments that provided much of the evidence at the later trial in Idaho. A nurse practitioner named Amanda Davis provided care for Rhoda during this time. During much of the time Davis treated Rhoda, she diagnosed Rhoda with amnesia, rather than dementia. After prescribing medication to treat pneumonia and memory loss, Rhoda's memory and physical health improved significantly.

Rhoda and Cynthia travelled to Sandpoint in June 2021 and stayed in one of the units in the Idaho structure for the summer. Rhoda's sister and brother-in-law, Barbara and Thomas Spade,

---

[2] While Bobby's attorney consistently spells her name as "Deanna" in his court filings, we note that it is sometimes spelled as "DeAnna" in various places in the record, including an exhibit depicting an image from her Facebook account.

[3] The court explained that testimony showed Bobby has "intellectual challenges" stemming from complications during his birth and that witnesses explained he is susceptible to the influence of others.

would take Rhoda to the senior center in Sandpoint approximately once a week and frequently visited her at the property. Barbara testified that Rhoda told her she did not want her grandchildren to have the property and that she asked if there was a way to keep the grandchildren from inheriting it. Importantly, the reference to "grandchildren" could only mean Cynthia's children since Bobby does not have children. Thomas corroborated Barbara's account, testifying that Rhoda approached him that summer and asked how to "get her grandchildren off of her will" and prevent Cynthia's husband (Larry) from gaining control of the property. Thomas also testified that he told Rhoda that she could quitclaim the property to Bobby and introduced her to an employee at the title office who could complete the paperwork to transfer Rhoda's property interest.

In late August 2021, Thomas introduced Bobby and Rhoda to Raquel Brown, the title company employee, at the title company office. Brown was not able to complete the deed paperwork with Rhoda and Bobby because a surviving spouse affidavit concerning Morgan had not been recorded. Brown testified that Rhoda did not appear confused about the process and that Thomas did not engage in conversation after making introductions. On September 7, 2021, Bobby picked up Rhoda, telling Cynthia he was taking Rhoda to "get breakfast." Bobby first took Rhoda to McDonald's for breakfast. Afterwards, he took her to the title company where Rhoda signed a surviving spouse affidavit and a quitclaim deed to convey her interest in the two-unit structure to Bobby. Bobby and Rhoda lacked a copy of Morgan's death certificate, which delayed the recording of the transfer. Bobby later recorded the quitclaim deed and the surviving spouse affidavit on October 15, 2021. Cynthia was not informed of the transfer.

After returning to Arizona, Rhoda met with Davis for a medical appointment on September 22, 2021. At that appointment, Davis noted Rhoda's memory loss was still "stable." The "6CIT Dementia Test" was administered again, and Rhoda scored an 8, indicating "mild cognitive impairment." Davis maintained the diagnosis of amnesia and abnormal weight loss.

On October 13, 2021, Cynthia discovered that Bobby had taken Rhoda to the title company in September and that a quitclaim deed to the two-unit structure in Sandpoint had been executed. Larry got into an argument with Bobby about making additions on the property. Bobby responded by stating that he owned the property "now." Cynthia then directed her son to search the Bonner County records, where he found the quitclaim deed. Cynthia asked Davis to write a letter explaining Rhoda's condition. That letter states that "[t]he above cited patient is under my care. In

4

August 2020, she was diagnosed with a cognitive impairment. She is not capable of making financial or medical decisions independently."

Davis continued to care for Rhoda following Cynthia's discovery of the property transfer. On February 2, 2022, Rhoda was treated at Northern Cochise Community Hospital for pneumonia. The records from that visit listed dementia in Rhoda's medical history; however, she was currently "oriented times three" (person, place, time). She was discharged on February 4, 2022. At a follow-up visit with Davis on February 10, 2022, Rhoda denied memory loss, but Davis listed her diagnosis as dementia (instead of amnesia) for the first time since one of her earliest appointments.

## B. The Arizona and Idaho court proceedings

On November 18, 2021, approximately one month after learning of the quitclaim deed transferring all interest in the Idaho property to Bobby, Cynthia filed a petition for appointment of a guardian and conservator for Rhoda in Arizona.[4] Bobby responded to the court in Arizona via email to object to the petition. In that email, he stated that Rhoda "is suffering from mild dementia where she forgets to eat meals, or needs help for some one [sic] to write out her bills, [and] sometimes calls someone a different name," but that she did not need a conservator. On March 10, 2022, the Superior Court of Arizona, Cochise County, determined, by clear and convincing evidence, that Rhoda was an incapacitated person and appointed Cynthia as her guardian and conservator.

On July 1, 2022, Cynthia filed a complaint in Bonner County, Idaho, in her new capacity as Rhoda's guardian and conservator. She asked the district court for: (1) a declaratory judgment that the title transfer from Rhoda to Bobby was invalid and void ab initio, (2) a judgment quieting title of the property against Bobby and Deanna Shaw (Bobby's wife); and (3) an award of economic damages based on her fraud claims against Bobby, Deanna, and Thomas. She also sought punitive damages. Cynthia filed an amended complaint on July 27, 2022, and then a second amended complaint ("the operative complaint") on September 8, 2022, requesting a declaratory judgment and quiet title against Bobby, and alleging fraud against all defendants. This complaint also removed the request for punitive damages. Cynthia also filed a "Notice of the Foreign Judgment" on October 18, 2022, which requested the district court to recognize the Arizona court's order appointing Cynthia as guardian and conservator over Rhoda under Idaho Code section 15-

---

[4] To avoid confusion when discussing Rhoda's actions in the underlying facts of the dispute, this opinion refers to Cynthia when discussing filings, motions, and arguments made in the Bonner County district court and Arizona Superior Court.

13-401. The Idaho district court entered its scheduling order on April 12, 2023, which required that discovery be served and responded to at least 60 days before the three-day trial. The start date of the trial was later moved to February 28, 2024.

On April 28, 2023, Cynthia filed a "Petition to Establish Date of Incapacity" with the Arizona court that issued the guardianship. Cynthia then filed an "alternate" motion in the Idaho district court ("the second motion to amend") on August 10, 2023, seeking to further amend the operative complaint by adding additional causes of action for "property damages and conversion," as well as a statement that the execution of the deed was "procured by undue influence" under the cause of action for quiet title. The court refrained from ruling on the motion at a hearing on August 24, 2023, and memorialized its decision denying the motion in an order on September 15, 2023, specifically noting that the order "does not prevent [Cynthia] from seeking leave to amend the Complaint in the future."

Cynthia filed successive motions requesting that the Idaho district court stay the litigation. The first motion to stay, filed on November 10, 2023, requested a stay because the "Petition to Establish Date of Incapacity is currently pending [in Arizona] which will decide [the] issue" of whether Rhoda was "mentally competent enough at the time to have testamentary and contractual capacity." The district court denied that motion on December 8, 2023, on the basis that, while the Arizona court was looking at Rhoda's capacity and need for a guardian and conservator in a *general sense*, the pending Idaho case would determine whether Rhoda lacked capacity to convey her property at a *specific moment in time*. The court concluded that "I don't think the Arizona court is trying this matter. And I'm not sure if they did, if it would -- well, we'd have to litigate that, but I'd be surprised if it would be binding on this [c]ourt given the unusual procedural posture." The court agreed that Cynthia could file another motion if the Arizona court "decide[d] to take up that issue."

On December 20, 2023, the Arizona court entered an order concluding that it "has jurisdiction over the guardianship and conservatorship case because [Rhoda] lives in Cochise County. As conservator, [Cynthia] is charged with preserving her mother's assets and protecting them in her stead." It further explained that "[t]he venue for resolving those questions [about the property] lies where the answers are located. In this case, the witnesses who can answer the questions live primarily in Cochise County. . . . [I]t is likely that it can be determined with some

6

degree of certainty if [Rhoda] was incapacitated when she signed over the [structure in Idaho] to her son."

Cynthia then filed another motion to "strike" the trial date or stay the litigation in the Idaho district court on January 4, 2024. She argued that the Arizona court's newest order "unequivocally affirm[ed] Arizona's personal jurisdiction over Rhoda Shaw's capacity to transfer assets in September of 2021." The district court denied Cynthia's motion to strike the trial date or stay the litigation at a hearing on January 18, 2024. On January 23, 2024, the Arizona court issued its order on the "Petition to Establish Date of Incapacity." It found that Rhoda "lacked testamentary capacity as of no later than August 31, 2021." It also found that Rhoda "lacked contractual capacity as of no later than August 31, 2021."

Cynthia filed another motion to amend her complaint ("the third motion to amend") in the Idaho district court on January 8, 2024, which removed the fraud claim but, for the first time, added claims for undue influence, tortious interference, and constructive trust. The court denied the motion at a hearing on January 22, 2024, finding that it was prejudicial to Bobby and Thomas, and would (1) unnecessarily delay trial, (2) frustrate obtaining evidence of Rhoda's capacity, and (3) was not timely. Cynthia then filed a "Registration of Foreign Judgment RE: Guardianship and Conservatorship of Rhoda Shaw" on February 12, 2024, "pursuant to Idaho Code [section] 10-1302," which included the Arizona court's order retroactively setting the date for the onset of Rhoda's lack of capacity as August 31, 2021. She also filed a motion in Idaho to enforce the Arizona order on February 14, 2024. The Idaho district court denied the motion to enforce the order on February 26, 2024.

The Idaho bench trial commenced as scheduled on February 28, 2024, and was completed on March 1, 2024. The following witnesses testified: Cynthia, Bobby, Larry (Cynthia's husband), Deanna (Bobby's wife), Amanda Davis (Rhoda's nurse practitioner), Raquel Brown (title officer), Jesse Mask (Rhoda's brother), Amanda Adams (Cynthia's daughter), Julia Parker (a board-certified gerontological nurse called by Cynthia), Patricia McCarley (a neighbor and nurse practitioner called by defendants), Barbara Spade (Rhoda's sister and Thomas' wife), and Laura Sweeney (Thomas and Barbara's daughter). Following the trial, the district court first issued Findings of Fact and Conclusions of Law as to Thomas Spade on May 29, 2024, dismissing all claims against him with prejudice. The court later issued its Memorandum Order and Decision, Findings of Fact, and Conclusions of Law on the bench trial on June 7, 2024, dismissing all claims

against Bobby and quieting title to the Sandpoint, Idaho property in Bobby's name. Cynthia then appealed to this Court.

For ease of reference, the following timeline depicts the sequence of events described above as they transpired in Arizona and Idaho.



*Figure One. Timeline of significant events in Arizona and Idaho.*

## II.    STANDARDS OF REVIEW

"Enforcement of a foreign judgment is 'a question of law over which this Court exercises free review.' " *Coeur d'Alene Tribe v. Johnson*, 162 Idaho 754, 757, 405 P.3d 13, 16 (2017) (quoting *Burns v. Baldwin*, 138 Idaho 480, 483, 65 P.3d 502, 505 (2003)). But "[a] district court's decision to exercise jurisdiction and proceed with an action even though a similar action is pending in another court is reviewed for abuse of discretion." *Slavens v. Slavens*, 161 Idaho 198, 201, 384 P.3d 962, 965 (2016).

"Following a bench trial, this Court will not set aside a trial court's findings of fact unless they are clearly erroneous." *Frost v. Gilbert*, 169 Idaho 250, 262, 494 P.3d 798, 810 (2021) (citing *Turcott v. Est. of Bates*, 165 Idaho 183, 188, 443 P.3d 197, 202 (2019)); I.R.C.P. 52(a)(7). We exercise free review over a trial court's conclusions of law. *Frost*, 169 Idaho at 263, 494 P.3d at 811).

"A court's decision to allow the amendment of pleadings is reviewed for an abuse of discretion." *Hayward v. Valley Vista Care Corp.*, 136 Idaho 342, 345, 33 P.3d 816, 819 (2001). "[W]e must determine whether the court: '(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.' " *Eagle Rock Timber, Inc. v. Teton Cnty.*, 172 Idaho 172, 177, 531 P.3d 488, 493 (2023) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

## III.    ANALYSIS

### A. The district court did not abuse its discretion in denying Cynthia's motions to stay the Idaho trial.

Cynthia argues that the district court abused its discretion in denying her motions to stay the Idaho litigation based primarily on the following reasons: (1) the Arizona Superior Court "exercised personal jurisdiction over Rhoda Shaw first," (2) jurisdiction over Rhoda under the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act ("the Act"), A.R.S. §§ 14-12101 to 14-14503, was continuing, and (3) principles of comity dictated that Arizona's rulings should have been applied to the facts in the Idaho case. We address each of these arguments below.

*1.   The district court did not err in declining to stay the Idaho litigation.*

Cynthia maintains that the "first-to-file rule," comity, and policy considerations support her position on appeal. She contends that the first-to-file rule constrained the Bonner County district court's authority "to either vacat[e] or uphold[] the September 2021 quit claim deed based on Arizona's determination [that] Rhoda Shaw lacked contractual or testamentary capacity at the time." She claims that the petition for guardianship, filed on November 18, 2021, serves as the basis for this claim. It is true that Cynthia's petition for guardianship predated the filing of both her original complaint in Idaho (as Rhoda's guardian) on July 1, 2022, and her second amended complaint, filed on September 8, 2022. However, the Idaho district court *did* recognize the Arizona court's order appointing Cynthia as guardian and conservator over Rhoda. At issue here is whether the Arizona court's later order retroactively determining the date of Rhoda's incapacity—which was entered long after the Idaho case Cynthia initiated had commenced—was controlling in the Idaho litigation.

Cynthia cites caselaw from this Court and the Idaho Court of Appeals in support of the first-to-file rule: *Klaue v. Hern*, 133 Idaho 437, 440–41, 988 P.2d 211, 214–15 (1999) (concerning

Idaho and Washington cases), and *Diet Center, Inc. v. Basford*, 124 Idaho 20, 22, 855 P.2d 481, 483 (Ct. App. 1993) (concerning Idaho and California cases). *Klaue* outlines "two tests" that "govern the determination of whether a lawsuit should proceed where a similar lawsuit is pending in another court." *Klaue*, 133 Idaho at 440, 988 P.2d at 214 (first citing *Wing v. Amalgamated Sugar Co.*, 106 Idaho 905, 908, 684 P.2d 307, 310 (Ct. App. 1984), *overruled on other grounds by*, *NBC Leasing Co. v. R & T Farms, Inc.*, 112 Idaho 500, 733 P.2d 721 (1987); and then citing *Roberts v. Hollandsworth*, 101 Idaho 522, 616 P.2d 1058 (1980)). The first test requires an analysis of claim preclusion and issue preclusion if the first suit "has gone to judgment." *Id.* The second test is "whether the court, although not barred from deciding the case, should nevertheless refrain from deciding it." *Id. Klaue* further explains that *Diet Center, Inc.* provides the guidelines for exercising discretion under the second test. *Id.* (citing *Diet Ctr., Inc.*, 124 Idaho at 22–23, 855 P.2d at 483–84).

We hold that the first-to-file rule does not apply because Cynthia cannot satisfy either of the two tests. The first test cannot apply to Cynthia's petition for guardianship, the basis of her argument, despite the earlier order of the Arizona court granting that petition. The guardianship petition was merely seeking the appointment of a guardian and conservator, and the Arizona court's order granting the guardianship neither mentioned the Idaho property nor placed the conveyance of Rhoda's property to Bobby at issue. Moreover, Cynthia's later "Petition to Establish Date of Incapacity" in the Arizona court *post-dates* the filing of her complaint in Idaho. While it is possible that this later petition might have implicated *Klaue* because it could be "another action pending between the same parties for the same cause," *Klaue*, 133 Idaho at 440, 988 P.2d at 214 (citation omitted), it cannot qualify here because Cynthia filed it on April 28, 2023—301 days after the filing of her complaint in Idaho. Thus, we are presented with two actions under our evaluation of *Klaue*'s first test: an Arizona guardianship action that does not address the conveyance of the lakeside structure at issue, and an Idaho action that directly addresses the conveyance of the lakeside structure.

Cynthia appears to concede, by repeated references to duplicative litigation, that the Idaho litigation squarely puts the conveyance of Rhoda's interest in the property and Rhoda's capacity at issue. Therefore, under the first test in *Klaue*, the district court was not required to stay the litigation because the guardianship action, which had been fully adjudicated before the complaint

10

was filed in Idaho, did not directly place either the conveyance of Rhoda's property in Idaho or her capacity *at the time of the conveyance*, at issue.

Cynthia cannot satisfy the second test because the record does not show the district court abused its discretion based on the considerations enumerated in *Klaue* and *Diet Center, Inc. See Klaue*, 133 Idaho 440, 988 P.2d at 214; *Diet Ctr., Inc.*, 124 Idaho at 22–23, 855 P.2d at 483–84. Those considerations include: (1) the identity of the real parties in interest, (2) the similarity of the claims or issues, (3) "whether the court in which the matter already is pending is in a position to determine the whole controversy and to settle all the rights of the parties," and (4) accounting for the "occasionally competing objectives of judicial economy, minimizing costs and delay to litigants, obtaining prompt and orderly disposition of each claim or issue, and avoiding potentially inconsistent judgments." *Klaue*, 133 Idaho at 440, 988 P.2d at 214 (emphasis omitted) (quoting *Diet Ctr., Inc.*, 124 Idaho at 22–23, 855 P.2d at 483–84). In its Memorandum Order and Decision, the district court explained:

> The [c]ourt's reasoning for according no weight to the Arizona court's orders on incompetency were extensively addressed on the record at multiple hearings. Suffice it to note that as to the Arizona court's unorthodox and curious "backdating" of its finding of incompetency, such a finding does not change the fact that this case arises under Idaho Code [section] 32-107. The judicial determination of incapacity in Arizona was made after the conveyance at issue in this case. "Backdating" the finding cannot change that fundamental fact. Of course, as explained multiple times on the record, had the Arizona court case and its finding of incompetence predated the conveyance, under Idaho Code [section] 32-108 the conveyance would have been voided.
>
> . . . *On the limited record provided to the Arizona court*, this [c]ourt would have ruled similarly. However, having now held a full trial on the merits and having heard from all parties as well as interested and disinterested witnesses, the full story is far more complicated.

(Emphasis added).

This summary by the district court of the factors it considered indicates that it carefully weighed all the evidence introduced by both sides at the Idaho trial. Unlike the proceeding in Arizona, *all of the parties* participated and numerous witnesses *for both sides* testified in the Idaho trial. The comprehensive analysis by the Idaho district court comports with our caselaw establishing how a court may find a person to be incapacitated for purposes of a guardianship under Idaho Code section 15-5-501(a). *See Rogers v. Household Life Ins. Co.*, 150 Idaho 735, 738, 250 P.3d 786, 789 (2010) ("[A] judicial finding of incapacity and appointment of guardian must be

supported by evidence of multiple events that demonstrate the individual's inability to care for his basic needs, property, and financial affairs[.]"). Likewise, when evaluating testamentary capacity under the Uniform Probate Code, a person:

> must have sufficient strength and clearness of mind and memory, to know . . . the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of persons who are to be the objects of his bounty, and his relation towards them.

*In re Est. of Conway*, 152 Idaho 933, 943–44, 277 P.3d 380, 390–91 (2012) (quoting *In re Heazle's Est.*, 74 Idaho 72, 76, 257 P.2d 556, 558 (1953). Conversely, it does not appear that Thomas Spade, who introduced Bobby and Rhoda to Brown at the title office and was present for the initial meeting, participated in the Arizona proceedings. The district court's citation of Idaho Code section 32-107 also indicates that it considered the possibility that Rhoda's conveyance could be rescinded, regardless of the Arizona court's determination of competency. In other words, the court did not foreclose the possibility that Cynthia could demonstrate at trial that Rhoda lacked capacity at the time of the conveyance. On this record, the district court's consideration of evidence from all parties supports our conclusion that Cynthia cannot satisfy the second test for the first-to-file rule, given the specific considerations from *Klaue* and *Diet Center, Inc. Klaue*, 133 Idaho 440, 988 P.2d at 214; *Diet Ctr., Inc.*, 124 Idaho at 22–23, 855 P.2d at 483–84

The district court's reasoning for denying Cynthia's pre-trial motions to stay provides further grounds for concluding that it did not abuse its discretion. In her motion, Cynthia claimed Rhoda's mental capacity was "pending before the Arizona Superior Court in Cochise County, and a hearing on the matter has already been held." The district court in Idaho denied that motion, explaining that the court in Arizona was addressing a different matter—the need for a guardianship and Rhoda's capacity generally—rather than the facts of a disputed conveyance of real property in Idaho. It acknowledged that the Arizona court's determination of guardianship was "entitled to full faith and credit" and that a final resolution on capacity would have to be honored by Idaho. It explained that, in Idaho, under *Rogers v. Household Life Insurance Co.*, 150 Idaho 735, 738, 250 P.3d 786, 789 (2011), a person who makes a contract prior to a judicial determination of incapacity can still be demonstrated to have lacked capacity at the time of the contract after a trial on that issue. The court also noted that the issue before it was "precisely about whether or not Ms. Shaw had the mental capacity to convey her property or not."

The district court also correctly emphasized that most of the witnesses to the transaction in question were located in Idaho and that the property at issue is located in Idaho. It concluded that the inquiry of whether Rhoda had capacity at the time of the conveyance was not, at least originally, at issue in the Arizona guardianship case and, when it surfaced much later, the Arizona court did not hear from all the witnesses that would testify in Idaho to that discrete issue. Based on these findings, which are fully supported by the record, we conclude that the Idaho district court properly analyzed this issue under *Klaue* and its reasoning does not show an abuse of discretion.

   2. *"Continuing Jurisdiction" under the Arizona Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act did not extend to the Idaho litigation.*

   Cynthia next claims that the Arizona court's "exclusive and continuing" jurisdiction under its guardianship act, A.R.S. §§ 14-12101 to 14-12503, required that the district court stay or dismiss the complaint because Arizona was the exclusive forum for determining Rhoda's capacity as it related to the transfer of her property in Idaho. She claims that review of the Act shows the district court "failed to recognize that Arizona had exercised personal jurisdiction over Rhoda Shaw first, that Arizona's jurisdiction was continuing, and that the Arizona Superior Court had statutory authority to declare whether Rhoda lacked capacity when she disposed of her interest" in the Idaho property.

   Cynthia's interpretation of the Act is belied by the actual text of the statute. Before addressing Cynthia's citations to the Act, we note its general definitions. As explained in Article 1 of the Act, a " 'Guardianship proceeding' means a judicial proceeding in which an order for the appointment of a guardian is sought or has been issued." A.R.S. § 14-12102(6). " 'Guardianship order' means an order appointing a guardian." A.R.S. § 14-12102(5). Article 2 of the Act, titled "Jurisdiction," provides further explanation that the provisions of the Act are limited to proceedings *appointing* a guardian for an adult person. *See* A.R.S. §§ 14-12201 to 14-12209. It "provides the exclusive jurisdictional basis for a court of this state [Arizona] to appoint a guardian or issue a protective order for an adult," and no more. A.R.S. § 14-12202. Moreover, section 14-12203 of the Act describes "jurisdiction" as applying to the court's power to appoint a guardian or issue a protective order. These provisions demonstrate that "jurisdiction" under the Act solely relates to a court's power to appoint and oversee guardians. It does not suggest an Arizona court has authority to go back and ascertain the date of the onset of the incapacity to a time pre-dating the guardianship petition when that issue was not presented in the original petition but was squarely raised in an earlier case in another state filed by the *same* guardian.

13

Cynthia's argument is also contrary to section 14-12205 of the Act. That section, titled "Exclusive and continuing jurisdiction," reads, "a court that has appointed a guardian or issued a protective order consistent with this chapter has exclusive and continuing jurisdiction *over the proceeding* until it is terminated by the court or the appointment or order expires by its own terms." A.R.S. § 14-12205 (emphasis added). As stated above, the Act defines a "Guardianship proceeding" as a "judicial proceeding in which an order for the appointment of a guardian is sought or has been issued." A.R.S. § 14-12102(6). Thus, the Arizona court's continuing jurisdiction only pertains to the proceedings affecting the status of Rhoda, as the ward, and Cynthia, as her guardian. Simply put, these provisions of the Act prevent courts in other jurisdictions from appointing additional guardians for the same ward or removing a guardian appointed by an Arizona court. In the case below, the Idaho district court recognized the Arizona court's jurisdiction to appoint Cynthia as Rhoda's guardian and honored its order appointing her.

Cynthia's other citations to the Act are also unavailing. For example, she cites Arizona Revised Statutes section 14-5424(C) for the proposition that a conservator's duties include managing the ward's assets (including real property in other states) and prosecuting actions in any jurisdiction to protect the ward's estate. This section recognizes that a conservator may initiate actions for the ward or defend the ward in actions in other jurisdictions. But, contrary to Cynthia's argument, it does not bestow jurisdiction to Arizona over any action in another state affecting the interests of a ward, nor does it require the other state to yield oversight to the Arizona court that appointed the guardian. In short, Cynthia's position that the Act requires the Idaho court to stay or dismiss the action for lack of jurisdiction simply because the Arizona court had commenced a guardianship proceeding is inconsistent with Arizona Revised Statutes section 14-5424(C).

Cynthia proceeds to emphasize the definition of "home state" in the Act and its preeminence as the preferred court of jurisdiction in guardianship proceedings. Again, it is true that, under Arizona Revised Statutes sections 14-12203 and 14-12209, a home state may exercise jurisdiction over a proceeding already filed in a significant-connection state. But that only applies to cases where guardians are appointed. *See* A.R.S. § 14-12203 ("A court of this state has jurisdiction to appoint a guardian or issue a protective order . . . .); A.R.S. § 14-12209 (for "proceedings in more than one state," a court in Arizona that has jurisdiction under section 14-12203 as the home state, "may proceed with the case"). While these statutes allowed for Cynthia to petition to become Rhoda's guardian in Arizona, they do not purport to give the Arizona

14

guardianship court power to adjudicate the validity of a real property transfer in Idaho, especially where that question did not arise until after Cynthia had already submitted to Idaho's jurisdiction by filing an action in Idaho seeking to adjudicate that very issue.

Cynthia's arguments—that the Act grants the Arizona court exclusive jurisdiction over any matter in any state that relates to Rhoda and her assets—do not comport with the text of the Act. Our reading of the Act shows that the "continuing jurisdiction" discussed in the Act only applies to the guardianship itself. Because the complaint Cynthia filed in Bonner County, Idaho, was not a guardianship proceeding—it concerned the validity of a real estate transaction in Idaho—we affirm the district court's decision that it had jurisdiction to decide the issue Cynthia placed before it.

**B. The district court did not abuse its discretion by denying Cynthia's motion to amend her complaint to add an undue influence claim and to add Barbara Spade as a party.**

Cynthia argues the Idaho district court's denial of her motion to amend her complaint to add a claim for undue influence violated Idaho Rule of Civil Procedure 8 and Idaho's notice pleading standard. She initially claimed that she was not required to file an amended complaint for the court to consider this claim at trial, but she later argues that she alleged sufficient facts to try the claim "within the context of a motion to amend her complaint" pursuant to Rule 15(a)(2). This motion to amend, less than two months before trial, attempted to add a new party and three new claims, including a cause of action for undue influence, none of which Cynthia had explicitly pleaded. The district court denied the motion to amend because the motion was untimely and prejudicial to the defendants. The district court also reasoned that granting the motion to amend would require a delay of the trial to allow the parties to conduct further discovery on the new claims and that evidence concerning Rhoda's capacity would be harder to obtain and evaluate as time went on.

Rule 15(a) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." I.R.C.P. 15(a)(2). Rule 8, which concerns notice pleading, describes the requirements of a pleading to validly state a claim for relief. Cynthia's argument on this issue focuses on how her proposed amended complaint satisfies the requirements of Rule 8. However, her attempt to add a cause of action for undue influence 556 days after filing her initial complaint requires us to evaluate the district court's decision under both Rule 15 and Rule 8.

*1. The district court did not abuse its discretion by denying the Rule 15 motion to amend.*

Motions for leave to amend pleadings in Idaho are "liberally granted." *Taylor v. McNichols*, 149 Idaho 826, 847, 243 P.3d 642, 663 (2010). An "outright refusal to grant the leave without any justifying reason appearing for the denial . . . is merely [an] abuse of . . . discretion and inconsistent with the spirit" of Rule 15. *Clark v. Olsen*, 110 Idaho 323, 326, 715 P.2d 993, 996 (1986) (quoting *Foman v. Davis*, 371 U.S. 178, 183 (1962)) (comparing the United States Supreme Court's exegesis of Federal Rule of Civil Procedure 15(a) with Idaho Rule of Civil Procedure 15(a)). But "a district court can act within the bounds of its discretion when denying a motion to amend." *Eagle Rock Timber, Inc. v. Teton Cnty.*, 172 Idaho 172, 186, 531 P.3d 488, 502 (2023). Reasons justifying denial of a motion to amend a pleading include, but are not limited to: undue delay, bad faith and dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility. *Zeyen v. Pocatello/Chubbuck Sch. Dist. No. 25*, 165 Idaho 690, 695, 451 P.3d 25, 30 (2019) (discussing the "*Foman* factors" as articulated in *Foman*, 371 U.S. at 182).

Bobby argues that the district court did not abuse its discretion in denying Cynthia's Rule 15 motion to amend. He correctly notes that the motion to amend was filed: (1) approximately one and one-half years into the action; (2) seven months after the court's deadline to amend pleadings; (3) well after the discovery deadline; and (4) only weeks before trial. He also recounts the district court's reasoning that discovery would have to be reopened and that the defendants had no notice of the added claim.

A review of our precedents applying these factors supports the district court's decision in this case. In *Zeyen*, we affirmed the district court's denial of a motion to amend a complaint when the denial was based on undue delay and prejudice to the school district. *Zeyen*, 165 Idaho at 694–95, 701, 451 P.3d at 29–30, 36. Zeyen sought to add additional constitutional claims for takings and due process violations long after discovery had closed. *Id.* at 693, 695–96, 451 P.3d at 28, 30–31. Zeyen's delay was undue because he waited over two years from the commencement of the litigation to add the claims and there was not "new law" that made those constitutional claims valid during the litigation. *Id.* at 696, 451 P.3d at 31. As in the case at bar, the trial court in *Zeyen* found that the defendants would suffer prejudice based on the need to reopen discovery if the district court permitted the amendment. *Id.* at 697, 451 P.3d at 32. We held that the trial court properly considered the *Foman* factors and did not abuse its discretion. *Id.*

Cynthia's appeal draws a close comparison to our ruling in *Zeyen*. In the case before us, the district court provided a thorough explanation of its reasons for denying Cynthia's motion to amend at a hearing on January 22, 2024. It summarized the three causes of action identified in Cynthia's second amended complaint, filed September 8, 2022. None of these proposed causes of action included undue influence. It emphasized that the proposed third amended complaint included three new causes of action and added an additional party (Barbara Spade, the wife of Thomas Spade), mere weeks before trial. It justified its concern that granting the motion would "derail [the] trial" because: (1) the new party would need counsel; (2) discovery would have to be reopened; and (3) expert testimony would probably need to be secured based on the new causes of action. The court noted that its scheduling order, issued in April 2023, stated that amendments to pleadings needed to be filed within 60 days of that order, meaning Cynthia filed her motion to amend approximately seven months after that deadline. Finally, the court emphasized that in August—approximately five months before the final motion to amend—Cynthia filed an earlier motion to amend "in the alternative," but failed to add undue influence. The court found all these reasons showed there was no good cause to grant the motion and that the defendants would be prejudiced by the untimely amendment. The court also found that Cynthia likely sought to delay trial to secure an order from the Arizona court, which is an explicit consideration under the *Foman* factors. Cynthia had already filed multiple motions to stay the Idaho proceedings and repeatedly argued that Arizona had exclusive jurisdiction over the issue. These findings are supported by the record.

For these reasons, we hold that the district court acted within the bounds of its discretion and correctly applied the *Foman* factors. We emphasize a few points from the district court's reasoning recounted above because they were well-supported in the record. First, the district court's conclusion that Cynthia had a dilatory motive in moving to amend her complaint was evident. The district court reasoned that at that point in time—January 2024—counsel wanted to secure an amendment to the complaint before the Arizona court determined whether Rhoda's incapacity existed on the date of the conveyance.

Second, Cynthia's previous motions to amend demonstrated "repeated failure to cure deficiencies by amendments previously allowed." She filed her original complaint on July 1, 2022, and amended it on July 27, 2022, as a matter of right. She then filed a Rule 15 motion to amend on September 2, 2022, and filed her second amended complaint on September 8, 2022. She also

17

filed a motion to amend "in the alternative" to a site inspection on August 10, 2023. The district court eventually denied that motion on September 15, 2023. Thus, Cynthia had approximately 405 days between the filing of the initial complaint and the filing of her alternative motion to amend to assert a cause of action for undue influence.

Third, the district court's explanation that proceeding with an undue influence claim would require reopening discovery and prejudice the defendants is supported by the record. In Idaho, the elements of undue influence are: "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." *Gestner v. Divine*, 171 Idaho 159, 168, 519 P.3d 439, 448 (2022). At the hearing below, Bobby argued that "big elements with the undue influence claim . . . are not borne out in any of [Cynthia's] three prior complaints," specifically the third element—a disposition to exert undue influence.

For these reasons we conclude that the district court did not abuse its discretion in denying Cynthia's motion to amend.

### 2. *Cynthia's attempt to assert her claim for undue influence without an amendment would not satisfy notice pleading under Rule 8.*

As noted, Bobby argued at the hearing on Cynthia's final motion to amend that "big elements with the undue influence claim [were] not borne out in any of" the multiple versions of Cynthia's complaint. As a result, Bobby chose "not to take certain depositions" based on the pleadings in the case. Cynthia argues that all four elements of undue influence were pleaded in the operative complaint, which was the second amended complaint. Cynthia claimed at the hearing on her final motion to amend that these elements were supported, in order, by the following paragraphs in the second amended complaint:

- Element 1 (person subject to influence): paragraphs 15, 25, and 38 (medically diagnosed cognitive impairment; lack of power to transfer property; detrimental reliance on trusted family members' statements; and inability to make financial decisions);

- Element 2 (opportunity to exert undue influence): paragraphs 19 through 21, 31, 32, and 33 (taking Rhoda to the title company instead of for "breakfast" and inducing Rhoda to comply with transferring her property);

- Element 3 (disposition to exert undue influence): paragraphs 23 through 25 and 31 through 35 (Bobby and Thomas were in positions of trust and lied to Rhoda and Cynthia about the purpose and nature of "breakfast"); and

18

- Element 4 (result indicating undue influence): paragraphs 31, 32, and 37 through 39 (Rhoda was damaged by loss of her title interest in the property).

As noted above, this case was initially pleaded as a fraud case. The elements of fraud are: (1) a statement or representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge about its falsity or ignorance of its truth; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury. *VanRenselaar v. Batres*, 176 Idaho 282, ___, 575 P.3d 866, 878 (2025). Yet, as noted, the elements of undue influence are: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence. *Gestner*, 171 Idaho at 168, 519 P.3d at 448.

A comparison reveals that fraud and undue influence not only contain different elements, but they also contain entirely unrelated elements. In other words, simply pleading fraud—a cause of action that requires nine elements instead of four—does not automatically encompass the distinct requirements of undue influence. Consequently, it cannot be somehow viewed as a lesser included cause of action, which is why it is common for plaintiffs to allege both claims in the same action. *See Quemada v. Arizmendez*, 153 Idaho 609, 614, 288 P.3d 826, 831(2012); *Sawyer v. Huff* (*In re Eggan's Est.*), 86 Idaho 328, 331, 386 P.2d 563, 564 (1963).

Although it is possible for a court to consider a cause of action in a bench trial that was (1) not explicitly pleaded in the operative complaint and (2) denied as an amendment under Rule 15, the unpleaded cause must comply with Rule 8 and notice pleading. *See Brown v. Greenheart*, 157 Idaho 156, 160, 164, 335 P.3d 1, 5, 9 (2014). Its content must be "sufficient in detail to put the parties on notice that [undue influence] . . . was at issue in the case[.]" *Id.* at 164, 335 P.3d at 9. Cynthia cites several cases where a complaint sufficiently pleaded a cause of action without explicitly stating the cause; however, the defendants' answers in these cases defended against the cause explicitly or by implication. *See Mortensen v. Stewart Title Guar. Co.*, 149 Idaho 437, 444–45, 235 P.3d 387, 394–95 (2010) (breach of the covenant of diligence was not explicitly pleaded, but defendant "signaled" it understood that to be a claim); *Christensen v. Rice*, 114 Idaho 929, 931–32, 763 P.2d 302, 304–05 (Ct. App. 1988) (defendant's "colloquy" at trial demonstrated awareness of the cause of action).

*Brown* concerned the inadvertent conveyance of water rights appurtenant to a parcel. 157 Idaho at 159–60, 335 P.3d at 4–5. The quiet title complaint and answer alleged various causes and

defenses, only one of which concerned contract interpretation. *Id.* at 160, 335 P.3d at 5. After hearing motions and cross motions for summary judgment, the district court held that "matters presented by both sides in support of the motions for summary judgment raise the issue of whether there was a mistake[.]" *Id.* Before the bench trial, the defendant asserted mutual mistake had not been pleaded by the plaintiff. *Id.* The plaintiff then filed a motion to amend the complaint to add mutual mistake. *Id.* The district court denied the motion to amend the complaint but ruled that "the issue of mutual mistake had been sufficiently [pleaded] in the original complaint." *Id.* This Court affirmed the district court and specifically held that the plaintiff pleaded mutual mistake "with sufficient particularity." *Id.* at 164, 335 P.3d at 9. This Court reviewed the factual description of the conveyance from the plaintiff's complaint, which sufficiently described how both parties did not intend to transfer water rights with the property, demonstrating notice of the mistake claim. *Id.* We also noted that the parties disputed the propriety of allowing that claim at a hearing before the trial. *Id.*

"The key issue in determining the validity of a complaint is whether the adverse party is put on notice of the claims brought against it." *Gibson v. Ada Cnty. Sheriff's Dep't*, 139 Idaho 5, 9, 72 P.3d 845, 849 (2003). We hold that, unlike in *Brown*, Bobby and Thomas were not on notice that undue influence, and specifically, a disposition to exert undue influence, was a claim brought against them. Like the parties in *Brown*, undue influence was a *concept* discussed before trial. But the earliest mention of undue influence was on August 10, 2023, more than 13 months after the original complaint was filed. That mention was in a motion filed to amend the complaint "in strict alternative and assuming (1) [Cynthia's] motion for a trial continuance is granted; and (2) the [c]ourt is inclined to deny [Cynthia's] Motion to Compel a Property Inspection based on the current pleadings." (Underline in original). The court later explained that, at that time, "counsel wasn't entirely sure there were factual bases to actually amend the complaint," and that it left the motion open with the opportunity to re-notice it. We cannot view the earlier motion to amend the complaint in the alternative, which was denied due to lack of a factual basis, as putting the Respondents on notice of the claim.

As we once wryly held, a defendant cannot be found to have notice of a claim when the plaintiff presents a "four-legged animal with fur and a tail labeled 'cat' " and later proffers that animal as "a dog." *Brown v. City of Pocatello*, 148 Idaho 802, 810, 229 P.3d 1164, 1172 (2010). We acknowledge the context in which undue influence can be supported at trial—that is, the nature

20

and force of evidence that we have recognized as supporting a finding of undue influence. "[E]stablishing undue influence is often heavily reliant on circumstantial evidence and resulting inferences[.]" *Smith v. Smith* (*In re Est. of Smith*), 164 Idaho 457, 475, 432 P.3d 6, 24 (2018).

> As to what is sufficient must depend upon the facts and circumstances of each particular case. . . . [B]ut one main, underlying principle, whatever the phraseology, is found in all; and that is that the evidence required to establish [undue influence] need not be—indeed, cannot be—of that direct, affirmative, and positive character which is required to establish a tangible physical fact. The only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred.

*Id.* at 475–76, 432 P.3d at 24–25 (quoting *In re Randall's Est.*, 60 Idaho 419, 430, 93 P.2d 1, 5 (1939)). We agree with the district court's statement that there is "no way to read [the] complaint to believe it was going to assert undue influence," based on the timing of Cynthia's two assertions of undue influence and the lack of factual allegations supporting a "disposition to exert undue influence," which is a necessary element of the claim. While fraud and undue influence may be related in some ways, notice of one does automatically provide notice of the other.

### C. Cynthia's argument that the district court misinterpreted the 1985 deed is moot.

Cynthia argues that the 1985 quitclaim deed—from Rhoda and Morgan to Rhoda, Morgan, and Bobby—created a tenancy in common in which Rhoda, Morgan, and Bobby each owned an undivided one-third interest. Although Bobby now maintains that he was granted a one-half interest in 1985, Cynthia maintains that Bobby's initial answer to her complaint, in which he admitted that the deed divided the property into one-third interests, was a binding judicial admission.

Inasmuch as we have held that the district court did not abuse its discretion by denying Cynthia's motions to amend her complaint, the nature of the tenancy in common that was granted in 1985 is now moot because the 2021 quitclaim deed and the judgment of the district court quieted title to the two-unit structure solely in Bobby's name. As a result, we decline to address these arguments.

### D. Thomas Spade's request for attorney fees on appeal is denied.

The other defendant-respondent in this case, Thomas Spade, raises three issues on appeal. Like Bobby, he argues that (1) the district court did not err in denying Cynthia's motions to amend her complaint to add a cause of action for undue influence and (2) the facts in Cynthia's second amended complaint do not sufficiently allege the elements of a claim for undue influence. Our

holdings, affirming the district court's exercise of discretion in denying the amendments and denying the undue influence claim, apply equally to Thomas. Thus, we proceed to his remaining claim for attorney fees on appeal based on Idaho Code section 12-121.

"Attorney fees may . . . be awarded under section 12-121 'if the appeal was brought or defended frivolously, unreasonably, or without foundation.' " *Erickson v. Erickson*, 171 Idaho 352, 371, 521 P.3d 1089, 1108 (2022) (citation omitted). "An award of fees under section 12-121 is within this Court's discretion." *Id.* (citation omitted). Thomas grounds his argument on the frivolousness of Cynthia's motions before and after trial at the district court. He maintains that the district court properly granted attorney fees to him based on its determination that Cynthia's pursuit of a fraud claim against him was frivolous.

Although it is a close question, we hold that Cynthia's appeal as it relates to Thomas was not frivolous. The issue relevant to Thomas is Cynthia's argument that the district court erred by not allowing her to bring an undue influence claim against him and Bobby at trial. Cynthia's last motion to amend her complaint named Thomas as a party against whom she wanted to pursue this claim. Cynthia's appeal on this issue did not merely "invite[] the Court to second-guess the findings of the lower court." *Millard v. Talburt*, 173 Idaho 533, 550, 544 P.3d 748, 765 (2024) (citation omitted). We conclude that her appeal raised genuine and fairly debatable concerns as to the district court's exercise of its discretion in applying Rules 15 and 8 of the Idaho Rules of Civil Procedure. Therefore, we decline to award attorney fees on appeal to Thomas Spade under Idaho Code section 12-121.

## IV. CONCLUSION

We conclude that the district court did not abuse its discretion in declining to stay the litigation or to recognize the Arizona court's retroactive order in the guardianship case as determining the date of incapacity for purposes of the Idaho case. Likewise, we hold that, under the circumstances present here, the court did not abuse its discretion under Rule 15 or Rule 8 by denying Cynthia's final motion to amend her complaint by adding a party and adding a cause of action for undue influence. No attorney fees are awarded but Respondents are entitled to costs on appeal as a matter of course pursuant to Idaho Appellate Rule 40(a).

Chief Justice BEVAN, Justices BRODY, ZAHN, and MEYER CONCUR.